1999-NMSC-010

976 P.2d 20

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Joe Jerry TORRES, Defendant–Appellant.**

**No. 23334.**

Supreme Court of New Mexico.

Feb. 15, 1999.

Phyllis H. Subin, Chief Public Defender, Laurel A. Knowles, Assistant Appellate Defender, Santa Fe, D. Eric Hannum, Assistant Public Defender, Albuquerque, for Appellant.

Hon. Tom Udall, Attorney General, Margaret McLean, Assistant Attorney General, Santa Fe, for Appellee.

*OPINION*

MINZNER, C.J.

{1} Defendant–Appellant Joe Jerry Torres appeals from the judgment of a bench trial finding him guilty of driving while his license was suspended or revoked, NMSA 1978, § 66–5–39 (1993), and the verdict of a jury trial finding him guilty of driving while intoxicated (DWI), NMSA 1978, § 66–8–102 (1993, prior to 1997 amendment), careless driving, NMSA 1978, § 66–8–114(B) (1969), failure to maintain a traffic lane, NMSA 1978, § 66–7–317 (1978), and failure to yield to emergency equipment, NMSA 1978, § 66–7–332 (1978). We hold that Torres's motion for continuance should not have been denied and that this denial prejudiced Torres's defense. We also hold that testimony as to the results of a Horizontal Gaze Nystagmus (HGN) test should not have been admitted at trial, because the State failed to lay a proper foundation for the admission of this expert testimony. Although the State qualified a police officer as an expert in administering the test, it failed to show the evidentiary reliability of HGN testing. For these reasons, we reverse and remand for a new trial.

## I. BACKGROUND

{2} During the course of Torres's trial, Officer Joseph Byers described the sequence of events that led to his arresting Torres on January 16, 1994. Byers testified that, as he was concluding his shift, he observed a pickup completely weaving off the roadway into the shoulder while traveling from Interstate 40 onto Interstate 25 in Albuquerque. The vehicle then jerked back into the traffic lane. After switching on his siren and red flashing lights, and after the pickup failed to respond, Byers maneuvered his patrol car parallel to the pickup and shined his spotlight into its interior. Despite having the spotlight aimed at his face, the driver of the pickup faced straight ahead and continued at a speed of fifty-five miles per hour. Byers identified Torres as the driver he saw with his spotlight and testified that he saw no other person in the vehicle during this time.

{3} Byers briefly pursued the pickup as it continued weaving on the freeway before exiting and making its way to a dead-end street. Byers followed the pickup down the street, and the driver parked under a carport. Byers testified that it was dark underneath the carport. Byers pulled up behind the pickup, but as the driver started to exit the vehicle, Byers was having difficulty shifting into park and switching off his siren. Byers then ran to the pickup and found Torres sitting on the driver's side. After encountering some resistance from Torres, Byers handcuffed him, placed him under arrest for DWI, and put him in the back of the patrol car. Byers testified that a strong smell of alcohol emanated from both the pickup and Torres's breath and that Torres had bloodshot eyes and slurred speech. Torres told Byers that he was not the driver of the pickup. He later argued to the jury that he had only been a passenger in the pickup during the traffic violations and that the driver of the pickup ran away from the truck before Byers made his way under the carport.

{4} Soon after Byers arrested Torres, Officer David Bowdich arrived at the scene to assist Byers. Bowdich took over the investigation and, based on observations leading him to believe Torres was intoxicated, administered three field sobriety tests: the nose touch test, the finger count test, and the HGN test. In administering the HGN test, Bowdich held a pen approximately twelve inches from Torres's face and asked him to focus on the top of the pen and follow it as it moved. Bowdich then determined whether Torres's eyes smoothly tracked the movement, whether there was any jerking of the eyes as the pen moved to a forty-five degree angle, and whether the eyes could remain at a forty-five degree angle.

{5} At trial, the State introduced testimony from Officer Bowdich concerning results of the HGN test he performed on Torres. Torres objected on the grounds that Officer Bowdich was not qualified to testify about the administration of the HGN test and that the State had failed to demonstrate the HGN test's evidentiary reliability in proving intoxication. The trial court overruled the objection and allowed Bowdich's testimony.

{6} Before resting his case on April 11, 1995, Torres's counsel moved for a continuance due to a witness's failure to appear at trial. Torres's counsel had delivered a subpoena form for the witness to the Sheriff's Department on March 31, 1995. According to Torres's counsel, this was standard procedure for the Public Defender's Office. On April 10, 1995, the first day of trial, the Sheriff's Department notified Torres's counsel that the subpoena had not been served. Defense counsel called the witness and requested his attendance. Upon the witness's failure to appear, Torres's counsel made a proffer of the expected testimony. Nevertheless, the trial court denied his motion for continuance.

{7} At the end of trial, the jury found Torres guilty of DWI, careless driving, failure to maintain a traffic lane, and failure to yield to emergency equipment. Following a bench trial, the court found Torres guilty of driving with a revoked license. The trial court then conducted a sentencing hearing and determined that Torres had three prior DWI convictions. As a result, the trial court sentenced Torres for felony DWI consistent with Section 66–8–102(G), as well as for the other counts on which Torres had been convicted.

{8} Torres appealed to the Court of Appeals, contending that the trial court abused its discretion in denying Torres's motion for continuance or, alternatively, that Torres received ineffective assistance of counsel due to counsel's failure to ensure the missing witness's attendance. Torres also contended that the trial court abused its discretion in admitting Officer Bowdich's testimony regarding the HGN test and that the State failed to introduce sufficient evidence to support one of his three prior DWI convictions. Pursuant to NMSA 1978, § 34–5–14(C)(2) (1972), the Court of Appeals certified the appeal to this Court on the ground that Torres's contentions presented the following issue of substantial public importance: "whether an appellate court can take judicial notice that certain scientific evidence is admissible when the evidence was admitted at

trial without the necessary foundation." Certification Order, COA No. 16,654 (filed Dec. 7, 1995). Because we conclude that the trial court erred in denying Torres's motion for continuance, thereby necessitating a new trial, we need not reach the issue of ineffective assistance of counsel or the issue of the sufficiency of evidence to prove the prior DWI conviction. In order to answer the question certified by the Court of Appeals and to provide guidance on remand, however, we do reach the issue of the admissibility of the HGN test and conclude that the trial court erred in admitting the testimony as to the test's results.

## II. MOTION FOR CONTINUANCE

{9} Torres claims that the trial court abused its discretion in denying his motion for a continuance. For the reasons that follow, we agree.

{10} "The grant or denial of a motion for a continuance rests within the sound discretion of the trial court, and the burden of establishing an abuse of discretion rests with the defendant." *State v. Sanchez,* 120 N.M. 247, 253, 901 P.2d 178, 184 (1995). There are a number of factors that trial courts should consider in evaluating a motion for continuance, including the length of the requested delay, the likelihood that a delay would accomplish the movant's objectives, the existence of previous continuances in the same matter, the degree of inconvenience to the parties and the court, the legitimacy of the motives in requesting the delay, the fault of the movant in causing a need for the delay, and the prejudice to the movant in denying the motion. *See Case v. Mondragon,* 887 F.2d 1388, 1396 (10th Cir.1989) (listing similar factors); *Dickerson v. Alabama,* 667 F.2d 1364, 1370 (11th Cir.1982) (same); *Eldred v. Commonwealth,* 906 S.W.2d 694, 699–700 (Ky.1994) (same). In the context of a continuance requested for the purpose of obtaining a witness's testimony, these factors serve to balance a criminal defendant's constitutional right to compulsory process, U.S. Const. amends. VI, XIV,[1] with the court's

---

1. The United States Supreme Court has held that this Sixth Amendment right is incorporated in

the Due Process Clause of the Fourteenth

interest in controlling its docket and the public's interest in the efficient administration of justice without unnecessary delay. In this case, the denial of the motion for continuance does not follow from a logical application of these factors. Therefore, we conclude that the trial court erred in denying the motion for continuance. *Cf. March v. State*, 105 N.M. 453, 455–56, 734 P.2d 231, 233–34 (1987) (concluding that the trial court's failure to grant a motion for a continuance in order to obtain a medical evaluation to determine capacity to form specific intent deprived the defendant of due process).

■ {11} The State contends that Torres caused the need for the delay by failing to subpoena the witness properly. We disagree. The record indicates that defense counsel delivered a completed subpoena form to the Bernalillo County Sheriff's Department for this witness at least ten days before trial. The record supports the conclusion that the Sheriff's Department failed to serve the witness. Further, the Sheriff's Department did not notify defense counsel that the subpoena had not been served until the day of trial. At that time, defense counsel contacted the witness and requested his attendance. Under these circumstances, defense counsel acted with reasonable diligence in securing the witness's testimony, and Torres should not be faulted for the witness's failure to appear. *See State v. Valmoja*, 56 Haw. 452, 540 P.2d 63, 64 (1975) (per curiam) ("[A]fter service of subpoenas on the absent witnesses a reasonable time prior to the trial date [ten days], counsel for the defendant did not demonstrate any lack of diligence by relying on their appearance if he had no cause to believe they would not appear, of which there is no evidence.").

■ {12} The State also contends that Torres suffered no prejudice as a result of the trial court's denial of Torres's motion, because the proffered testimony was merely cumulative and "not critical." The State misidentifies the proper inquiry: We do not ask whether the evidence was critical but, instead, whether Torres made a "plausible showing of how [the witness's] testimony would have been both material and favorable to his defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *cf. March*, 105 N.M. at 456, 734 P.2d at 234 ("[T]he prejudice which must be raised in a case such as this is minimal."). We disagree with the State that the testimony would have been cumulative, and we conclude that Torres made a sufficient proffer that the testimony would have been both material and favorable to his defense. In his proffer, Defense counsel stated that "[the absent] witness is the whole show for the Defense." The proffer supports the conclusion that the missing witness's testimony was essential to the defense theory Torres was trying to establish at trial.

{13} According to Torres, the witness would have testified that he saw Torres's pickup pull into the carport followed by a police car coming down the street. The witness then would have testified that he saw a person other than Torres exit the driver's side of the vehicle, climb over a fence, and disappear before the police officer's arrival. Torres's proffer, then, is consistent with his theory that another individual was driving the truck at the time of Officer Byers's pursuit. If proven, this theory might serve to exculpate Torres in this case.

{14} Torres introduced the testimony of another witness, who stated that Torres had left that witness's house with another person and that the other person had been driving the pickup. This testimony does not make the proffered testimony of the person who witnessed the pursuit cumulative. The only evidence introduced regarding the same subject matter as the proffer—i.e., the identity of the driver at the time of the traffic

Amendment and therefore applicable against the several states:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as

an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

violations—was the testimony of Officer Byers, who testified that he saw Torres driving the car. In addition, the State impeached the memory of Torres's other witness with questions about the date on which he remembered seeing Torres leave with another person. Thus, we believe Torres suffered substantial prejudice due to the trial court's denial of the motion for continuance. *See Valmoja,* 540 P.2d at 64 ("By denying the motion for continuance when defense counsel had acted diligently to procure the absent witnesses and their testimony was relevant and material to the defense, the district judge denied [defendant's right to compulsory process].").

{15} Additionally, we believe other factors support granting the motion. First, it appears that this was the first continuance sought by defense counsel, and there is no indication that defense counsel used the motion as a dilatory tactic. Second, Torres requested only enough time to serve the witness effectively and to compel the witness to testify. Defense counsel indicated that a week would be adequate but that an attempt could be made to do it in less time. In this context, less than one week is not a sufficiently lengthy delay to justify intrusion on a criminal defendant's right to compulsory process.

{16} The State claimed that it was unlikely that any delay would increase the likelihood that the witness would appear, given the number of contacts between counsel and the witness. Because the subpoena had not been delivered, however, the witness was not compelled to testify on the day of the motion. It is reasonable to assume that the witness would be more likely to appear under the threat of arrest. Further, because defense counsel was able to contact the witness the morning of trial, it does not appear that it would be unduly difficult for the Sheriff's Department to locate the witness in order to serve the subpoena.

■ {17} It appears that the trial court was concerned about the potential inconvenience of a delay to the jury. The trial began on a Monday, and Torres requested the continuance on Tuesday. The trial court had indicated to the jury at the outset that the trial would be over by Wednesday. In addition, before the court adjourned after the first day of trial, the trial court reassured the jury that the trial was proceeding on schedule. Finally, the trial court denied the motion in part because there was "a jury of 14 selected who have been told that we will be through with this trial by Wednesday." While the trial court's concern about expediency was appropriate, there is no indication in the record that a delay of two to seven days would have created any potential conflicts for the jury. In the absence of such a conflict, the trial court's generalized concerns about expediency are not sufficient to override Torres's constitutional right to compulsory process. *See Eldred,* 906 S.W.2d at 700 ("Of course, any change in trial date is going to cause some inconvenience. Thus, in order to become a factor for consideration there must be some significant or substantial inconvenience, which should be demonstrated on the record."). The State did not make a sufficient showing that granting the motion would have created a significant inconvenience to the court or either party.

■ {18} Ultimately, the trial court discounted the persuasive value of the proffered testimony. The trial court stated, "[H]is testimony, as far as I can see, is in direct conflict with at least one APD officer, and I don't see any indication that would swing the balance in the evidence I've seen before me in the last day or so." The record indicates that the trial court, in reaching its conclusion, made an evaluation of the credibility of the police officer and determined that Torres's proffer was not sufficient to overcome the officer's testimony. This decision improperly intruded upon the functions of the jury. *See State v. Alberico,* 116 N.M. 156, 164, 861 P.2d 192, 200 (1993) ("One of the most fundamental rules of American jurisprudence is that the jury has the privilege to believe or to disbelieve any testimony it hears."). We conclude that the denial of the motion in this case was an abuse of discretion, and we are not persuaded that the error was harmless. Therefore, we reverse Torres's convictions and remand for a new trial.

### III. HGN TESTIMONY

{19} Torres also argues that the trial court erred by admitting testimony from Officer Bowdich on the results of the HGN test. Specifically, Torres raises the following points of error: (1) that the State failed to lay a proper foundation demonstrating that the HGN test was reliable scientific evidence, and (2) that the State failed to lay a proper foundation in qualifying Officer Bowdich as an expert in the administration of the HGN test. Both of Torres's contentions relate to the provisions bearing on the admissibility of scientific and other expert evidence as set forth in Rule 11–702 NMRA 1999.

{20} Although we are remanding for a new trial because of the trial court's error in denying Torres's motion for a continuance, we also address his contentions regarding the HGN evidence because this issue will recur on retrial and there is conflicting law on the subject. In particular, we find no clear guidance from other jurisdictions with regard to both the general standards they employ for evaluating the evidentiary reliability of expert testimony and their specific treatment of HGN evidence. *See generally* 1 Richard E. Erwin, *Defense of Drunk Driving Cases: Criminal–Civil* § 10.11 (3d ed. 1994 & Supp.1994) (noting lack of uniformity in treatment of HGN evidence); I Donald H. Nichols, *Drinking/Driving Litigation: Criminal and Civil* § 14:32.50 (Supp.1996) (same); John P. Ludington, Annotation, *Horizontal Gaze Nystagmus Test: Use in Impaired Driving Prosecution*, 60 A.L.R.4th 1129 (1988 & Supp.1998) (same). Further, in *State v. Burke*, 1999–NMCA–031, 126 N.M. 712, 974 P.2d 1169, *cert. denied*, 972 P.2d 351 (1999), the Court of Appeals issued a ruling on the admissibility of HGN evidence that may conflict with this opinion, as we explain below. *Cf.* NMSA 1978, § 34–5–14(B)(1) (1972) (providing that the Supreme Court may review by writ of certiorari a decision of the Court of Appeals that conflicts with a decision of the Supreme Court). Thus, we take this opportunity to correct the misapprehension of the law concerning HGN evidence that may arise as a result of *Burke* and the conflicting rulings of other jurisdictions.

### A. Preservation of the HGN Issue

{21} Before turning to the merits of Torres's contentions, we address the State's argument that Torres failed to preserve his evidentiary challenges below. Absent a question of jurisdiction, general public interest, or fundamental error, this Court reviews an alleged error in a trial court's evidentiary ruling only when the party alleging error makes a timely objection or motion to strike that states the specific ground of objection, if that ground is not apparent from the context. *See* Rules 11–103(A)(1), 12–216 NMRA 1999.

{22} The State contends that "Officer Bowdich testified at length before any defense objection was voiced" and that, as a consequence, "[t]his failure to timely and specifically object bars appellate review." We disagree for two reasons. First, the record shows that Torres made his objection while the State was laying the foundation for Officer Bowdich's HGN testimony. Torres specifically objected to both the officer's expertise and the reliability of the HGN test at the time the State was eliciting foundational matters from the officer, such as his HGN training and the manner in which he administered the test upon Torres. Second, the trial court considered Torres's objections at that time, inquired as to the grounds for his objections, and ruled on the issue. We therefore conclude that this objection was timely, and hence the issue of the admissibility of the HGN testimony was preserved for appellate review. *Cf. Nasser v. State*, 646 N.E.2d 673, 676 (Ind.Ct.App.1995) (concluding that a party opposing admission of an officer-expert's testimony regarding intoxilyzer results preserved specific foundational challenges on appeal by objecting, at trial, that the officer was not qualified as an expert because of his lack of expertise and his failure to comply with appropriate intoxilyzer-testing procedures). In reviewing this issue, however, we may affirm on grounds upon which the trial court did not rely unless those grounds depend on facts that Torres did not have a fair opportunity to address in the proceedings below. *See State v. Franks*, 119 N.M. 174, 177, 889 P.2d 209, 212 (Ct.App.1994).

## B. Evidentiary Reliability of HGN Testing

{23} "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." Rule 11–702. This Court has discerned three prerequisites in Rule 11–702 for the admission of expert testimony: (1) experts must be qualified; (2) their testimony must assist the trier of fact; and (3) their testimony must be limited to the area of scientific, technical, or other specialized knowledge in which they are qualified. *See Alberico,* 116 N.M. at 166, 861 P.2d at 202; *accord State v. Anderson,* 118 N.M. 284, 291–92, 881 P.2d 29, 36–37 (1994) (explaining the second and third prerequisites); *State v. Stills,* 1998–NMSC–009, ¶ 27, 125 N.M. 66, 957 P.2d 51 (explaining the third prerequisite). Torres contends that the State failed to lay a proper foundation demonstrating that the HGN test was reliable scientific evidence, and therefore that Officer Bowdich's testimony failed to satisfy any of the prerequisites for expert testimony under Rule 11–702. We agree that the HGN testimony was improperly admitted under the evidentiary reliability standard adopted by this Court in *Alberico,* 116 N.M. at 166–70, 861 P.2d at 202–06, and explained in both *Anderson,* 118 N.M. at 290–92, 881 P.2d at 35–37, and *Stills,* 1998–NMSC–009, ¶¶ 22–34, 125 N.M. 66, 957 P.2d 51.

{24} Following the lead of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), this Court has established that it is error to admit expert testimony involving scientific knowledge unless the party offering such testimony first establishes the evidentiary reliability of the scientific knowledge. *See Alberico,* 116 N.M. at 166–69, 861 P.2d at 202–05. This evidentiary reliability standard replaced the older, stricter "general acceptance" standard, which required the proponent to show that the knowledge was generally accepted by the relevant scientific community. *Daubert,* 509 U.S. at 587–89,

113 S.Ct. 2786 (holding that, with their focus on relevance, the Federal Rules of Evidence superseded the "general acceptance" standard established in *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923)); *Alberico,* 116 N.M. at 167–68, 861 P.2d at 203–04 (rejecting *Frye,* and citing *Daubert* favorably). *Alberico* therefore established evidentiary reliability as the hallmark for the admissibility of scientific knowledge.

{25} In *Anderson,* our first scientific knowledge case to follow *Alberico,* we considered the admissibility of deoxyribonucleic acid (DNA) typing under the restriction fragment length polymorphism (RFLP) method. *See Anderson,* 118 N.M. at 287–90, 881 P.2d at 32–35. *Anderson* reaffirmed *Alberico's* adoption of the evidentiary-reliability standard developed in *Daubert,* explaining that, " 'under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but *reliable.*' " *Anderson,* 118 N.M. at 291, 881 P.2d at 36 (emphasis added) (quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786). We explained further that, in considering the reliability of any particular type of scientific knowledge, the trial court should consider the following factors:

(1) whether a theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known [or] potential rate of error" in using a particular scientific technique "and the existence and maintenance of standards controlling the technique's operation"; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Id.* (quoting *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786) (alteration indicating wording in *Daubert*); *cf. E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex. 1995) (listing six factors to aid courts in determining evidentiary reliability).

{26} In *Stills,* our next scientific knowledge case, we considered whether the polymerase chain reaction (PCR) method of DNA analysis was admissible under the standards adopted in *Alberico* and reaffirmed in *Anderson. See Stills,* 1998–NMSC–009,

¶¶ 16–25, 125 N.M. 66, 957 P.2d 51. We held that, under the *Alberico–Daubert* standard, "the trial court did not abuse its discretion in admitting DNA typing evidence under the PCR technique." *Id.* ¶ 56, 125 N.M. 66, 957 P.2d 51. Like *Anderson, Stills* reaffirmed this Court's adoption of the evidentiary-reliability standard. *Alberico, Anderson,* and *Stills* all stand for the proposition that, in New Mexico, evidentiary reliability is the hallmark for the admissibility of scientific knowledge.

### 1. Standard of review

{27} "The rule in this State has consistently been that the admission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion." *Alberico,* 116 N.M. at 169, 861 P.2d at 205; *accord Anderson,* 118 N.M. at 292, 881 P.2d at 37; *Stills,* 1998–NMSC–009, ¶ 33, 125 N.M. 66, 957 P.2d 51. However, we have also noted:

> An abuse of discretion in a case [involving scientific evidence] can be found when the trial judge's action was obviously erroneous, arbitrary, or unwarranted.... [It] is not tantamount to rubber-stamping the trial judge's decision. It should not prevent an appellate court from conducting a meaningful analysis of the admission [of] scientific testimony to ensure that the trial judge's decision was in accordance with the Rules of Evidence and the evidence in the case.

*Alberico,* 116 N.M. at 170, 861 P.2d at 206; *accord Anderson,* 118 N.M. at 292, 881 P.2d at 37; *Stills,* 1998–NMSC–009, ¶ 33, 125 N.M. 66, 957 P.2d 51.

{28} Moreover, the threshold question of whether the trial court applied the correct evidentiary rule or standard is subject to de novo review on appeal. *See State v. Elinski,* 1997–NMCA–117, ¶ 8, 124 N.M. 261, 948 P.2d 1209 ("[O]ur review of the application of the law to the facts is conducted de novo."); *cf. State v. Attaway,* 117 N.M. 141, 144–45, 870 P.2d 103, 106–07 (1994) (discussing circumstances in which mixed questions of law and fact are subject to de novo review).[2] We realize that the *Alberico–Daubert* evidentiary standard gives rise to mixed questions of law and fact, and that the determination of whether to admit or exclude particular testimony under this standard may result from an inquiry that is " 'essentially factual.' " *Attaway,* 117 N.M. at 144, 870 P.2d at 106 (quoting *United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.1984) (en banc)); *cf. Alberico,* 116 N.M. at 168, 861 P.2d at 204 (listing factors for trial courts to consider "in assessing the validity of a particular technique"). All the same, we discern that a trial court's initial determination of whether to apply the *Alberico–Daubert* standard in a given context requires consideration of " 'legal concepts in the mix of fact and law and [the] exercise [of] judgment about the values that animate legal principles.' " *Attaway,* 117 N.M. at 144, 870 P.2d at 106 (quoting *McConney,* 728 F.2d at 1202); *see also* Clarence Morris, *Law and Fact,* 55 Harv.L.Rev. 1303, 1328–29 (1942) ("If a rule of law must be applied before a conclusion is reached, that conclusion is one of law."). As such, the initial determination of whether to apply the *Alberico–Daubert* standard entails a conclusion of law that is subject to de novo review. *Cf. Edens v. New Mexico Health & Soc. Servs. Dep't,* 89 N.M. 60, 62, 547 P.2d 65, 67 (1976) ("[C]onclusions of law are freely reviewable.").

2. We recognize that the standard for reviewing *Daubert* issues in the federal courts is currently subject to dispute. *Compare General Elec. Co. v. Joiner,* 522 U.S. 136, ——, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) ("[A]buse of discretion is the proper standard by which to review a district court's decision to admit or exclude scientific evidence."), *with Carmichael v. Samyang Tire, Inc.,* 131 F.3d 1433, 1435 (11th Cir.1997) ("We review the district court's legal decision to apply *Daubert de novo,* and its decision to exclude particular evidence under *Daubert* for an abuse of discretion." (citation omitted)), *cert. granted sub nom. Kumho Tire Co. v. Carmichael,* —— U.S. ——, 118 S.Ct. 2339, 141 L.Ed.2d 711 (1998). We determine, however, that de novo review concerning the threshold question of whether *Daubert* applies in a given situation is more consistent with the legal framework and policy considerations that underlie appellate review in New Mexico. *See Attaway,* 117 N.M. at 144–45, 870 P.2d at 106–07; *Elinski,* 1997–NMCA–117, ¶ 8, 124 N.M. 261, 948 P.2d 1209.

## 2. Novelty of scientific knowledge

■ {29} In making the initial determination of whether the *Alberico–Daubert* evidentiary standard applies, some courts have established a threshold requirement that the "scientific knowledge" at issue must be novel. *See, e.g., Thornton v. Caterpillar, Inc.,* 951 F.Supp. 575, 577 (D.S.C.1997) (*"Daubert* should only apply to novel scientific testimony."); *Johnson v. Knoxville Community Sch. Dist.,* 570 N.W.2d 633, 637 (Iowa 1997) (same). The better view, however, is that the *Alberico–Daubert* standard is not limited to novel scientific theories. *See Cummins v. Lyle Indus.,* 93 F.3d 362, 367 n. 2 (7th Cir. 1996) (citing *Daubert,* 509 U.S. at 592 n. 11, 113 S.Ct. 2786). While it is true that some of our past decisions involved scientific theories that may have been regarded as novel at the time, *see, e.g., Alberico,* 116 N.M. at 175, 861 P.2d at 211 (post-traumatic stress disorder); *Anderson,* 118 N.M. at 287–90, 881 P.2d at 32–35 (DNA typing under the RFLP method), we have never held that the *Alberico–Daubert* evidentiary standard is limited to scientific knowledge that is novel. Further, while a novel scientific theory might be admissible under the *Alberico–Daubert* standard, notwithstanding the fact that it has not achieved the level of acceptance required to meet the *Frye* standard, it does not follow that *Daubert* applies *only* to scientific knowledge that is novel or not generally accepted. On the contrary, the *Alberico–Daubert* standard explicitly incorporates "general acceptance" as a factor for courts to consider in determining the admissibility of scientific testimony, *see Anderson,* 118 N.M. at 299–300, 881 P.2d at 44–45, and we believe that the novel status of a particular scientific principle or procedure may be addressed in considering this factor. Indeed, in some contexts "novelty" may be nothing more than an antonym for "general acceptance." For these reasons, a finding that the scientific principles underlying HGN testing are generally accepted (or no longer a novelty) does not necessarily preclude consideration of other factors relevant to the *Alberico–Daubert* inquiry.

## 3. Scientific knowledge underlying HGN testing

■ {30} Courts in other jurisdictions disagree about whether the results of HGN testing in particular constitute scientific evidence that is subject to the *Alberico–Daubert* standard. *See State v. Meador,* 674 So.2d 826, 833–34 (Fla.Dist.Ct.App.1996) (noting that a minority of states have concluded that the HGN test is not based on scientific expertise, while the majority have concluded that the results of HGN testing are scientific evidence); *State v. Merritt,* 36 Conn.App. 76, 647 A.2d 1021, 1026–28 (1994) (same); *State v. Ruthardt,* 680 A.2d 349, 355–56 (Del.Super.Ct.1996) (same). Today we adopt the majority view that the results of HGN testing constitute scientific evidence that must meet the standard of evidentiary reliability articulated in *Alberico* and *Daubert.*

{31} The rationale for requiring evidence of HGN test results to meet the *Alberico–Daubert* standard has been well stated by other courts:

> [W]hile most of the field sobriety tests are self-explanatory, HGN is not. When courts have taken judicial notice of the common physical manifestations of intoxication, horizontal gaze nystagmus is not included. Horizontal gaze nystagmus is not just a symptom such as slurred speech or bloodshot eyes, which are commonly understood signs of intoxication....
>
> The phenomena being tested are predicated on a scientific or medical principle that the automatic tracking mechanisms of the eye are affected by alcohol....
>
> ....
>
> ... [T]he significance of the HGN observation is based on principles of medicine and science not readily understandable to the jury. We thus conclude that the HGN test is scientific evidence....

*Meador,* 674 So.2d at 833–34 (citations omitted); *accord Merritt,* 647 A.2d at 1026–28; *Ruthardt,* 680 A.2d at 355–56. We find this reasoning persuasive.

{32} Because we adopt this reasoning, we take this opportunity to correct any misapprehension of the law that may arise from *Burke,* 1999–NMCA–031, ¶¶ 11–14, 126 N.M.

712, 974 P.2d 1169. While the Court of Appeals correctly notes that the use of HGN testimony "is not lay opinion under Rule 11–701 NMRA 1999," *id.* ¶ 12, the discussion of the HGN testimony in that case does not support the general proposition that HGN evidence is "not based on scientific principles," *id.* ¶ 14. Indeed, "the trial court was never asked" to analyze the HGN evidence under the *Alberico–Daubert* standard in *Burke* because the defendant in that case "did not object below that there was no scientific basis for the officer's testimony; [he] never mentioned either ... *Alberico* ... or Rule 11–702." *Id.* We thus limit *Burke*, 1999–NMCA–031, ¶ 14, 126 N.M. 712, 974 P.2d 1169, to the situation where the trial court is not asked to perform an *Alberico–Daubert* analysis of HGN evidence, and thus the issue is not preserved for appellate review.

### 4. Admissibility of HGN test results in this case

{33} Because we conclude that HGN testing involves scientific knowledge, we hold that the HGN evidence in this case must satisfy the requirements of *Alberico–Daubert*. "In short, 'under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Anderson*, 118 N.M. at 291, 881 P.2d at 36 (quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786).

{34} Although "[t]he inquiry envisioned ... is ... a flexible one," *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786, determining the evidentiary reliability of scientific knowledge does require trial courts to consider several factors, *see Stills*, 1998–NMSC–009, ¶ 27, 125 N.M. 66, 957 P.2d 51; *cf. Anderson*, 118 N.M. at 291, 881 P.2d at 36 (listing factors). Further, the "overarching subject [of the inquiry] is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786;

*accord Alberico*, 116 N.M. at 168, 861 P.2d at 204.

{35} Our review of the record indicates that the trial court did not consider any of the required factors for assessing the evidentiary reliability of HGN testing in this case, nor was there an appropriate focus on principles and methodology. Rather, the trial court simply overruled Torres's objection that the State had failed to establish the evidentiary reliability of Officer Bowdich's HGN testimony, and no application of the *Alberico–Daubert* standard ensued. Because the trial court allowed the State to continue its questioning of Officer Bowdich concerning the HGN test without a proper inquiry into the evidentiary reliability of this test, we must presume that the trial court viewed the *Alberico–Daubert* standard as inapposite under the facts of this case. This view is premised on a misapprehension of the law, and we hold that the trial court's decision to admit the HGN testimony without applying the *Alberico–Daubert* standard is reversible error in this case.

{36} The State proposes three arguments to the contrary, but we remain unconvinced. First, the State relies on *State ex rel. Hamilton v. City Court*, 165 Ariz. 514, 799 P.2d 855, 858 (1990) (en banc), for the proposition that the proper foundation for HGN evidence "is limited to describing the officer's education and experience in administering the test and showing that proper procedures were followed." This argument is unpersuasive. Unlike New Mexico, the Arizona courts have rejected *Daubert* in favor of the "general acceptance" standard articulated in *Frye*, 293 F. at 1014. *See State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486, 491 (1998). Given that HGN testimony had been ruled admissible in Arizona courts four years prior to *City Court*, *see State v. Superior Court*, 149 Ariz. 269, 718 P.2d 171, 181 (1986) (en banc) we do not find it surprising that the prosecution met the "general acceptance" standard in that case without any additional testimony regarding the scientific principles upon which the HGN test is based. Further, we note that part of the reason the Arizona courts may regard such additional testimony as unnecessary is that they only admit HGN

evidence for limited purposes such as establishing probable cause and corroborating the results of more reliable sobriety tests such as chemical analyses of breath, blood, or urine. *See Superior Court,* 718 P.2d at 181–82. Thus, it is not clear that the HGN evidence in this case would be admissible under the Arizona standard, because the State was not using this evidence merely to corroborate a chemical analysis of Torres's blood alcohol content. Indeed, the State offered no such analysis in this case.

■ {37} Although the State presented evidence at trial as to Officer Bowdich's training and experience with HGN testing, we conclude that his training and experience are not sufficiently probative of the test's evidentiary reliability. We note that some courts have allowed the admission of HGN testimony for limited purposes without a scientific expert laying an appropriate foundation under the relevant admissibility standard. *See, e.g., Whitson v. State,* 314 Ark. 458, 863 S.W.2d 794, 798 (1993) (holding that admission of HGN evidence for the limited purpose of showing unquantified level of alcohol consumption did not require a preliminary inquiry regarding novel scientific knowledge); *State v. Murphy,* 451 N.W.2d 154, 157–58 (Iowa 1990) (holding that HGN testing is not unlike any other lay, field-sobriety test and that it therefore requires no admissibility foundation for scientific evidence); *City of Fargo v. McLaughlin,* 512 N.W.2d 700, 708 (N.D.1994) ("We agree with those cases holding that the only foundation required [for HGN testing] is a showing of the officer's training and experience in administering the test, and a showing that the test was in fact properly administered."); *State v. Bresson,* 51 Ohio St.3d 123, 554 N.E.2d 1330, 1336 (1990) (holding that HGN evidence is as admissible as would be other field sobriety tests). Nevertheless, we find persuasive the reasoning of other courts which have held that if police officers are not qualified to testify about the scientific bases underlying the HGN test, they are not competent to establish that the test satisfies the relevant admissibility standard. *See, e.g., People v. Leahy,* 8 Cal.4th 587, 34 Cal.Rptr.2d 663, 882 P.2d 321, 334 (1994) (in bank); *Merritt,* 647 A.2d at 1026–28; *People v. Vega,* 145 Ill.

App.3d 996, 99 Ill.Dec. 808, 496 N.E.2d 501, 504–05 (1986); *State v. Witte,* 251 Kan. 313, 836 P.2d 1110, 1116 (1992); *State v. Borchardt,* 224 Neb. 47, 395 N.W.2d 551, 559 (1986); *cf. Barrett v. Atlantic Richfield Co.,* 95 F.3d 375, 382 (5th Cir.1996) (holding that an animal behaviorist was not qualified to testify about the cause of observed chromosomal changes to rats due to their exposure to chemicals, or about the possible effects of similar exposure on humans, because such testimony was beyond his expertise); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 702.06[1], at 702–44 to –45 (Joseph M. McLaughlin ed., 2d ed. 1998) ("The trial court should exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise.").

■ {38} As its second argument in support of its contention that the trial court did not err in admitting the HGN evidence, the State cites case law from other jurisdictions for the proposition that HGN testing is generally accepted in the scientific community. *See, e.g., Superior Court,* 718 P.2d at 180–81, app. A, at 182, app. B, at 182–84 (concluding that HGN testing is generally accepted in the scientific community, and listing scholarly sources in support of this conclusion); *People v. Joehnk,* 35 Cal. App.4th 1488, 42 Cal.Rptr.2d 6, 9–17 (1995) (concluding, upon a review of the expert testimony introduced at trial as well as a review of the case law of California and other jurisdictions, that HGN testing is generally accepted in the scientific community as a useful tool when combined with other tests and observations); *Schultz v. State,* 106 Md.App. 145, 664 A.2d 60, 70–74 (1995) (taking judicial notice of the scientific validity of HGN testing based on reported case law and scientific literature). However, in *Alberico,* we concluded that "[i]t is improper to look for scientific acceptance only from reported case law." 116 N.M. at 167, 861 P.2d at 203. We reaffirm that conclusion today.

{39} The thrust of the policy behind *Alberico, Anderson,* and *Stills* is to broaden the trial court's role in admitting evidence of scientific knowledge. Specifically, *Alberico*

and its progeny allow a trial court to admit evidence of scientific knowledge that is adequately valid (from a scientific viewpoint) to be sufficiently reliable (from an evidentiary viewpoint). To facilitate this intent, *Alberico* rejected the principle that general acceptance within a particular scientific discipline was a necessary or sufficient condition for evidentiary admissibility. *See Alberico,* 116 N.M. at 167, 861 P.2d at 203.

{40} At this point, we do not decide whether HGN testing is adequately valid from a scientific point of view based on reported case law or other authorities. *Cf. Vega,* 99 Ill.Dec. 808, 496 N.E.2d at 504–05 (refusing to accept evidence regarding the scientific validity of HGN testing for the first time on appeal). Our holding is limited to whether the State provided sufficient support at trial for a threshold determination that the underlying "scientific technique is based upon well-recognized scientific principle and ... is capable of supporting opinions based upon reasonable probability rather than conjecture." *Alberico,* 116 N.M. at 167, 861 P.2d at 203. We hold that the State did not satisfy its *Alberico–Daubert* burden. Although Officer Bowdich testified that the National Highway Traffic Safety Administration (NHTSA) accepted HGN testing, that the test was nationally certified, and that the test was routinely given, his testimony was insufficient to establish the evidentiary reliability required by *Alberico–Daubert.* Officer Bowdich was not qualified to testify about the scientific bases of HGN testing, and although his testimony lent support for a conclusion that the test was widely used—thus giving rise to an inference of general acceptance— his testimony did not explain how the test proved intoxication. He therefore did not assist the trier of fact in understanding the scientific validity of the test. In addition, although his testimony supported an inference that various authorities believe HGN testing to be scientifically valid, his testimony did not provide the trier of fact with a ground on which to evaluate the basis of that belief.

{41} In its final argument, the State asserts that, "[i]f this Court desires, judicial notice may be taken of the limited fact that HGN is a scientific test used to determine whether someone is under the influence." We conclude at this point that HGN testing does not meet the criteria we have previously established for the proper taking of judicial notice:

> This court, since early territorial days, has expressed the view that courts will take judicial notice of matters of common and general knowledge.
>
> The matter of which a court will take judicial notice must be a subject of common and general knowledge. The matter must be known, that is well established and authoritatively settled. Thus, uncertainty of the matter or fact in question will operate to preclude judicial notice thereof.

*Rozelle v. Barnard,* 72 N.M. 182, 183, 382 P.2d 180, 181 (1963) (citations omitted); *accord Holton v. Janes,* 25 N.M. 374, 379, 183 P. 395, 397 (1919); *see also Hartford Accident & Indem. Co. v. Beevers,* 84 N.M. 159, 162–63, 500 P.2d 444, 447–48 (Ct.App.1972) (refusing to take judicial notice of a general law of nature concerning the combustibility of gases where there was no showing as to how this law was affected by variables).

{42} We are not persuaded that HGN testing is "a subject of common and general knowledge," or a matter "well established and authoritatively settled" in New Mexico. We therefore determine that judicial notice of the evidentiary reliability of HGN testing would be inappropriate at this time. Specifically, we hold that because the State failed to establish the evidentiary reliability of HGN testing, the HGN testimony should not have been admitted at trial.

## C. Qualification of an Expert in Administering an HGN Test

{43} Torres further contends that apart from failing to lay a proper foundation as to the evidentiary reliability of HGN testing, the State neglected to lay a proper foundation in qualifying Officer Bowdich as an expert in the administration of the HGN test. Like Torres's evidentiary reliability objection, this contention gives rise to Rule 11–702 concerns. To determine the appropriate scope of appellate review concerning this is-

sue, we must determine whether the *Alberico–Daubert* standard applies only to expert testimony that relies on scientific knowledge, or to all forms of expert testimony, including the administration of the HGN test by a trained observer. Courts in other states that have rejected the *Frye* standard in favor of *Daubert* are in disagreement as to the scope of *Daubert*'s application. *See generally* 4 Weinstein & Berger, *supra* § 702.05[2], at 702–35 to –38 nn. 10–11 (listing and summarizing cases that have come to opposite conclusions on this issue). We believe the better view is expressed by the United States Court of Appeals for the Tenth Circuit, which has concluded that "application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training." *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1518 (10th Cir.1996); *accord Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 n. 3 (9th Cir.1994) ("*Daubert* was clearly confined to the evaluation of *scientific* expert testimony. Special concerns arise when evaluating the proffer of scientific testimony that do not arise when evaluating [nonscientific testimony]." (citation omitted)); Edward J. Imwinkelried, *The Next Step After* Daubert: *Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony*, 15 Cardozo L.Rev. 2271, 2285 (1994) (explaining that the *Daubert* "test is useless as a criterion for the admissibility of other types of expert testimony").

{44} Under the Tenth Circuit view that we adopt today, the trial court did not err in declining to apply the *Alberico–Daubert* standard in determining the admissibility of Officer Bowdich's testimony as an expert in the administration of the HGN test. Officer Bowdich's expertise as an administrator of the HGN test was based solely on his experience and training, and we review the trial court's primarily factual ruling on Officer Bowdich's qualifications in this area for an abuse of discretion. *See Wood v. Citizens Standard Life Ins. Co.*, 82 N.M. 271, 273, 480 P.2d 161, 163 (1971).

{45} Regardless of whether the subject matter involves scientific, technical, or other specialized knowledge, however, a witness must qualify as an expert in the field for which his or her testimony is offered before such testimony is admissible.

Under [Federal Rule of Evidence] 702, a witness must qualify as an expert to testify on matters that are scientific, technical, or specialized in nature. The description of the kinds of testimony requiring expertise is broad, and so are the means to qualify a witness as an expert: What is required is "knowledge, skill, experience, training, or education."

It should be noted at the outset that normally the calling party must qualify the witness to testify as an expert first, before any substantive testimony is given.

3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 349, at 602 (2d ed.1994).

{46} We have already held that HGN testing involves scientific knowledge. We have also determined that Officer Bowdich does not qualify as a scientific expert who may establish the evidentiary reliability of HGN testing. Thus, the State finds itself in a quandary: Because HGN testing involves scientific knowledge, only a scientific expert may testify as to its results, and because Officer Bowdich does not qualify as a scientific expert, he may not testify about HGN test results. The question remains, however, whether witnesses who only qualify as non-scientific experts based on their training and experience may testify about the administration of tests involving scientific knowledge after an appropriate foundation regarding such knowledge has been laid by another, scientific expert. In the context of HGN testing, we conclude that such non-scientific experts may testify, provided that another, scientific expert first establishes the evidentiary reliability of the scientific principles underlying the test.

{47} Although experts who lack the qualifications necessary to testify about scientific knowledge cannot establish the evidentiary reliability of the scientific knowledge underlying the respective tests, they may, because of their training, experience, and specialized knowledge, testify as to the *administration* and *specific results* of the test after it has been shown to meet the

requirement of evidentiary reliability. We note that nystagmus, or jerking of the eyes, " 'can be observed directly and does not require special equipment.' " 1 Erwin, *supra* § 10.06[5], at 10–32 (quoting Transportation Safety Inst., NHTSA, U.S. Dep't of Transp., HS 178 R6/92, *DWI Detection and Standardized Field Sobriety Testing, Student Manual*, at VIII–16 to –18 (1992)). "In administering the HGN test a police officer will move an object back and forth in front of a drinking/driving suspect's face.... The officer will observe the suspect's eyes as they track the moving object, specifically taking note at what point each eye begins jerking." 1 Nichols, *supra* § 14:32.50, at 298; *see also* 1 Erwin, *supra* § 10.06[5], at 10–28 to –32. Based on this description and our review of the record in this case, we conclude that in order to establish the "technical or specialized knowledge" required to qualify a witness as an expert in the administration of the HGN test, there must be a showing: (1) that the expert has the ability and training to administer the HGN test properly, and (2) that the expert did, in fact, administer the HGN test properly at the time and upon the person in question.

{48} In the instant case, we conclude that the State satisfied these two foundational criteria. Regarding his ability and training to administer the HGN test properly, Officer Bowdich testified at trial that he had used the test on a regular basis, that he had conducted numerous HGN tests on subjects who had been drinking and on subjects who had not, and that he had been trained to determine, based on appropriate HGN test techniques, whether an individual had been drinking. This was sufficient. As for administering the HGN test properly at the time and upon the person in question, Officer Bowdich described the HGN test techniques he employed in administering the test to Torres on January 16, 1994, testified that the techniques he employed were those in which he had been trained, and explained that, based on his administering the test to Torres, he determined that Torres "had been drinking quite a bit." Again, this was sufficient. We thus conclude that the State properly qualified Officer Bowdich as an expert in the administration of the HGN test.

{49} Finally, we take the opportunity to correct the misapprehension of the law that may arise from *Burke*, 1999–NMCA–031, ¶ 15, 126 N.M. 712, 974 P.2d 1169. In that case, our Court of Appeals was confronted with a situation where the State offered an officer's testimony about HGN test results without first establishing that the officer did, in fact, administer the HGN test properly at the time and upon the person in question:

> [W]hen confronted with a photocopy of the training manual that the officer used when learning how to give HGN tests, [the officer] admitted that he used improper procedure on virtually every aspect of the test. Specifically, (1) he was looking for smooth tracking of the eyes after, rather than before, the test; (2) he checked for all three of the required clues during the same pass of the object before the subject's eyes, and he checked for these clues in two total passes, rather than checking for each of the three clues during two separate passes, for a total of six passes; (3) when he checked for maximum deviation, he held the object for two or three seconds, rather than the required four; and (4) he never spent the required four seconds getting to the 45–degree point.

*Id.* ¶ 3. Because of the officer's improper administration of the test, the Court of Appeals acknowledged that the HGN evidence may have been improperly admitted "[a]s expert testimony of a specific degree of intoxication." *Id.* ¶ 15. Nevertheless, the Court of Appeals concluded that this officer's HGN testimony was based on personal experience, rather than scientific knowledge. Thus, it held that the evidence was admissible. As discussed earlier, this ruling was incorrect insofar as it suggests that HGN evidence does not rely on scientific knowledge.

{50} The Court of Appeals also was incorrect in stating, "When used as nonscientific, expert testimony, we believe our Supreme Court would rule that deficiencies in conducting the HGN test such as [those shown above] would go to the weight, not the admissibility, of the evidence...." *Id.* ¶ 15. In light of the foundational requirements set

forth above, it is clear that this is not our view. As the partial dissent in *Burke* explains, "The officer ... acknowledged that his manner of conducting the test departed substantially from what was required by his training manual. Given that acknowledgment, I do not think that his personal experience with the HGN test provided a sufficient foundation for admitting the results of his test...." *Id.* ¶ 21 (Hartz, C.J., concurring in part, dissenting in part). We agree with the partial dissent in *Burke* that the foundational requirements for admitting the results of HGN testing were not met under these circumstances, and we overrule *Burke*, 1999–NMCA–031, ¶ 15, 126 N.M. 712, 974 P.2d 1169, to the extent it is inconsistent with this opinion.

### D. Harmless Error

{51} The State contends that, even if we find error in the admission of the HGN evidence, that error was harmless. Specifically, the State asserts: "Take away Officer Bowdich's testimony about the HGN test. The remaining evidence established Defendant failed both the finger count and the nose touch tests. Coupled with the personal observations of Officer Byers and Officer Bowdich, the effect, if any of the HGN testimony, was harmless." We disagree.

{52} In *Clark v. State*, 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991), we explained that "[e]rror in the admission of evidence in a criminal trial must be declared prejudicial and not harmless if there is a reasonable possibility that the evidence complained of might have contributed to the conviction." We conclude that the error in this case was not harmless, because there is a reasonable possibility that the admission of Officer Bowdich's HGN testimony might have contributed to Torres's conviction.

{53} We note at the outset that the State introduced no results from chemical tests to support its assertion that Torres was intoxicated at the time in question. Indeed, the State concedes that the evidence supporting the finding of Torres's intoxication was limited to the personal observations of Officers Byers and Bowdich as well as the results of three field sobriety tests, i.e., the HGN test,

the finger count test, and the nose touch test. In introducing these observations and tests at trial, the State presented the latter as more accurate than the former, for Officer Bowdich testified that he received at least some sort of training for each of the tests. Furthermore, among the three field sobriety tests, the State presented the HGN test as the most accurate, for Officer Bowdich testified that, of the three tests, he only regularly administered the HGN test in DWI investigations; that, of the three tests, he had only received formal training for the administration of the HGN test; and that, of all field sobriety tests, the HGN test was "the one test that cannot be beat." Hence, the State presented the HGN results to the jury as the most accurate indicator of Torres's intoxication. In this respect, this case is distinguishable from the analysis of harmless error in *Burke*, 1999–NMCA–031, ¶¶ 16–17, 126 N.M. 712, 974 P.2d 1169, where the prosecution emphasized the specific results of a breath test rather than the HGN evidence. Given the State's emphasis in Torres's trial, there is at least a reasonable possibility that the admission of the HGN evidence might have contributed to his DWI conviction. We thus conclude that the evidentiary error was not harmless.

### E. On Remand

{54} We conclude that the HGN testimony should not have been admitted at trial because it lacked the necessary *Alberico–Daubert* foundation. We also conclude that it would be appropriate for the trial court, on remand, to make the initial determination of whether HGN testing satisfies the *Alberico–Daubert* standard. *See Merritt*, 647 A.2d at 1027 (adopting the reasoning of "courts [that] have determined that a trial court, not an appellate court, provides the correct forum for the initial determination as to whether the criteria set forth in ... the appropriate state rule of evidence has been satisfied" (footnotes omitted)). In making this determination, the trial court shall consider the factors set forth in *Anderson*, 118 N.M. at 291, 881 P.2d at 36. If, after considering these factors on remand, the trial court determines that the State has satisfied its

burden of establishing the evidentiary reliability of HGN testing, then Officer Bowdich may testify about his administration of the HGN test. Further, if this Court or the Court of Appeals later publishes an opinion that decides the evidentiary reliability of HGN testing under the *Alberico–Daubert* standard, a trial court may reconsider the issue whether to take judicial notice of the test's evidentiary reliability, notwithstanding our conclusion that such judicial notice would be inappropriate at the present time. *Cf.* 3 Mueller & Kirkpatrick, *supra* § 353, at 657 (concluding that courts are "right to admit or exclude much evidence without 'reinventing the wheel' every time by requiring the parties to put on full demonstrations of the validity or invalidity of methods or techniques that have been scrutinized well enough in prior decisions to warrant taking judicial notice of their status").

## IV. CONCLUSION

{55} We hold that Torres's motion for continuance should not have been denied and that this denial prejudiced Torres's defense. We also hold that the testimony as to the results of the HGN test should not have been admitted at trial. For these reasons, we conclude that Torres is entitled to a new trial. Accordingly, we vacate the judgment of the district court and remand this case for a new trial to be conducted in a manner not inconsistent with this opinion.

{56} **IT IS SO ORDERED.**

FRANCHINI, BACA, SERNA, JJ., concur.

WECHSLER, J., New Mexico Court of Appeals (sitting by designation).